(No. 39282.—▇▇▇▇▇▇▇▇)
GOULD NATIONAL BATTERIES, INC., Appellant, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(VIRGINIA EVELYN RATCLIFF, Appellee.)

*Opinion filed Jan. 25, 1966.—Rehearing denied March 23, 1966.*

152

PRICE, NOETZEL, SCHLEGER & BURGESON, of Chicago, for appellant.

PAUL F. DAVIDSON and EVA L. MINOR, of Kankakee, for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

This workmen's compensation case is before us on appeal by the employer from the Kankakee County circuit court which confirmed an award to the widow of Guy Sterns Ratcliff for death which was found to have arisen out of and in the course of decedent's employment. The major issues are whether an accidental injury occurred and whether a causal connection was established between the duties of the husband's employment and his death.

The evidence indicates that decedent was employed in the lead casting department of respondent battery manufacturer. He commenced work with this employer on September 12, 1960, following a physical examination by the company physician, Dr. Reinhold Schuller, which revealed no abnormalities and specifically indicated the absence of any heart murmur or enlargement. He worked in the casting department until December, 1961, and then in the paste

department. In March, 1962, he experienced considerable left chest pain, particularly at night, became ill at work and oxygen was administered. He was seen by the company physician to whom he complained of left chest pain and who found a slight heart murmur and referred him to his family physician, Dr. Whalen, who diagnosed his difficulty as a severe cold. In April, 1962, decedent was transferred to the casting department where he continued to work until his death. On June 25 Dr. Schuller again saw decedent because of nausea and vomiting and again referred him to Dr. Whalen who returned him to work on July 7 with a diagnosis of possible coronary insufficiency. On July 13 decedent again complained of pain around his heart. At that time decedent commenced taking peritrate and phenobarbital, medication designed to dilate the blood vessels supplying the heart and to sedate the patient. Dr. Schuller testified that he had some question as to the type of work decedent could do in view of the diagnosis and discussed this with the nurse and the patient, but that decedent could, in the witness's opinion, do any type of work which did not require his presence in an area where heavy fumes were present and the supply of oxygen diminished. Dr. Whalen submitted a written report indicating the diagnosis and stating in answer to the question as to the amount of work and lifting the patient could do: "Observe to tolerance," which Dr. Schuller interpreted as meaning that "if a man cannot tolerate it, he should not do it." Dr. Schuller further testified he felt decedent could safely work in the casting department and permitted him to continue there in the same capacity.

The testimony establishes that the operations of the casting department are conducted in a large room some 300 feet square and 25 feet high in which are located 18 melting pots. Decedent's duties necessitated lifting lead pigs weighing 60-75 pounds each from a stack near him, placing them in the melting pots and subsequently ladling the molten lead from the pots into molds from which he later removed the

hardened contents. The exterior temperature on the day preceding death was 85°, and the temperature in the casting department 120-125°. There are hoods over the melting pots, but fumes therefrom circulate about the room. There are floor fans which blow toward the ceiling.

Decedent's foreman testified that about a week prior to death decedent had asked the foreman if he "would have the stacks of lead kept up" since "[t]he doctor told him he shouldn't bend down to pick up anything heavy," and that "he wasn't feeling good." The foreman made the requested arrangements.

On July 25 decedent went to work at the ordinary time. He commenced his usual routine. In the early afternoon he asked a fellow worker to stack an extra bundle of lead on his pile so he would not have to bend down so far since it hurt him to do so. In the course of the day decedent completed his assigned quota of work, apparently handling the contents of 1½ to 2 bundles of lead pigs, each bundle containing 24 pigs. He left at the usual quitting time. There was testimony that decedent was pale and was observed during the day sitting on the floor of the restroom (not particularly unusual for the workers) in midafternoon with his hand on his chest. He lit a cigarette and almost immediately extinguished it, saying he did not feel well. He later talked with his foreman about the work for the following day; the foreman testified decedent made no complaint to him of ill-being.

Decedent's wife testified that she arrived home after the decedent and observed him lying upon the couch, although the couch was new and no one was to lie upon it. He had done nothing toward preparing the evening meal, although he customarily did so if he returned from work before his wife. He was very quiet, ate little dinner and did not help with the dishes after the meal, although he usually did so. He rested after dinner and missed his usual evening newscasts. He was perspiring profusely all evening. The wife

further testified that after she returned from a visit to her mother's later that evening, she observed decedent sitting on the couch in his pajamas wiping perspiration from his brow. He came to bed fifteen to twenty minutes later. He arose a short while thereafter and asked his son to put the car in the garage. The bed was wet with perspiration where he had been lying. At about 1:15 A.M., July 26, he sat up in bed, put his feet on the floor and collapsed, apparently having suffered a coronary occlusion. He was pronounced dead a short while later by a physician.

It is apparent that this factual background bears similarities to other heart cases reviewed by this court in which compensation awards have been sustained. Appellant argues however that there exists a critical difference between this and other such cases concerning the medical testimony regarding the existence of a causal connection between the employment and subsequent death.

Testimony was given by Dr. Schuller on behalf of the employer. In this doctor's opinion there was no causal connection between the employment duties and the death. He stated that if working in extreme temperatures predisposed an individual to coronary occlusion, more people would die of this in summertime, and that he could not see any connection between heavy lifting and such occlusions because a lot of people who do not lift heavy objects die of coronary occlusion. While agreeing that Dr. Whalen's diagnosis of possible coronary insufficiency could be correct, he further testified that the type of work such an individual did made no real difference; while not giving a direct answer to a question as to the amount of lifting such a worker might safely do, Dr. Schuller was of the opinion that there was not enough physical strain involved in decedent's duties to warrant transferring him to a different department. He also stated decedent could have safely done "Any type of work that does not require any work, for instance, in heavy fumes where there is a lack of oxygen."

Dr. P. W. Sawyer, whose practice is restricted to internal medicine, was called by claimant. He testified that in his opinion the type of work done by decedent imposed a much greater burden upon his heart; that assuming the decedent was suffering from coronary insufficiency this type of work would have some causal relationship to his death. The doctor also described the symptoms of coronary insufficiency, the record indicating that many of these same symptoms were observed in decedent on July 25, and that the medication previously prescribed was compatible therewith. The dosage was sufficiently large to establish that the prescribing physician thought the "man was in trouble." In response to the other questions the doctor stated his opinion that "there might or could have been the causal relationship between his employment and his activities on the 25th of July and his subsequent death," but that it "is equally true that it might or could have been related to matters entirely separate from the employment."

Respondent initially argues that there has been no showing of accidental injury arising out of and in the course of employment, which of course must be established before an award may be allowed. *Clifford-Jacobs Forging Co.* v. *Industrial Com.* 19 Ill.2d 236; *American Brake Shoe Co.* v. *Industrial Com.* 20 Ill.2d 132; *Consumers Co.* v. *Industrial Com.* 364 Ill. 145.

This court has stated on numerous occasions that in order for an injury to be accidental within the contemplation of the Workmen's Compensation Act, it must be traceable to a definite time, place and cause, and occur in the course of employment unexpectedly. (*Laclede Steel Co.* v. *Industrial Com.* 6 Ill.2d 296.) However, the accidental injury need not be established by direct and positive testimony. It is sufficient if the evidence supports a reasonable inference that the physical stress occasioned by the employee's labor was such that his existing physical structure began to give way or gave way entirely while actually en-

gaged in his employment. (See *Johnson* v. *Johnson*, 32 Ill.2d 316, 320; *Gus T. Handge & Son Painting Co.* v. *Industrial Com.* No. 39134; *Clifford Jacobs Forging Co.* v. *Industrial Com.* 19 Ill.2d 236.) Merely because the ultimate manifestation of the basis for the claim (here, decedent's collapse and death) does not occur while the employee is actually engaged in the performance of his duties does not require, in our judgment, judicial disturbance of the Industrial Commission's determination that an accidental injury has occurred.

Here, decedent was performing his rather strenuous duties under 120-125° temperature conditions. There was testimony indicating manifestations of decedent's ill-being throughout the working day of July 25 as well as during the preceding months. Some evidence indicated fumes in the room where decedent worked, a condition conceded by the employer's doctor to be harmful to decedent's condition. We believe the testimony, referred to at some length earlier in this opinion, clearly supports a reasonable inference that the deterioration of decedent's existing physical structure manifested itself during his employment on July 25 even though its ultimate conclusion did not occur until late that night after decedent had gone to bed. This is sufficient, if credible, to comply with the requirement of establishing an accidental injury.

The troublesome question appearing here is whether claimant has sufficiently established a causal connection between decedent's employment and his resultant death. Dr. Sawyer, in response to a hypothetical question including substantially all of the testimony set forth earlier in this opinion, stated that in his opinion there might or could have been some causal relationship between decedent's employment on July 25 and his ensuing death. However, on cross-examination he admitted that it was equally possible that death was due to causes entirely unrelated to decedent's employment. Dr. Schuller, the company doctor, in response to the same hypothetical question, testified that in his opin-

ion decedent's employment on July 25 did not contribute to or cause his death.

As stated in *Mechanics Universal Joint Div., Borg-Warner Corp.* v. *Industrial Com.* 21 Ill.2d 535, 538, "* * * the determination of disputed questions of fact in Workmen's Compensation cases, including one of causal connection, is primarily a function of the Industrial Commission, and * * * its findings should not be disturbed by a reviewing court unless they are manifestly against the weight of the evidence, regardless of how the judiciary itself might have held had it been trier of the facts. [Citing cases]. Where the evidence is conflicting, or of such a nature that different inferences may be reasonably drawn therefrom, it is for the Commission to determine where the preponderance lies [citing cases] ; if, however, there is no substantial evidence to support an award, it is the court's duty to set it aside. [Citing case]."

We believe that this statement correctly summarizes this court's function on review of factual questions in workmen's compensation cases. It logically follows therefrom that although it may appear to this court upon the record before it that there are two views equally compatible with the evidence on the question of causal connection, the determination of the Industrial Commission should not be disturbed unless it can fairly be said that its decision cannot be legitimately inferred from the evidence before it and is, therefore, against the manifest weight of the evidence. Accordingly, where, as here, it may be legitimately inferred from the record as a whole that a causal connection exists between the employment and subsequent disability or death and the Industrial Commission finds that a causal connection has been established, this court will not disturb that determination.

The judgment of the circuit court of Kankakee County is affirmed.

*Judgment affirmed.*