(No. 42878.— )

MAXINE FLOYD, Appellee, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(THE CITY OF McLEANSBORO *et al.*, Appellants.)

*Opinion filed Sept. 29, 1970.—Rehearing denied Dec. 3, 1970.*

KEEFE AND DE PAULI, of East St. Louis, for appellants.

HANAGAN & DOUSMAN, of Mt. Vernon, for appellee.

Mr. JUSTICE KLUCZYNSKI delivered the opinion of the court:

In March 1967, petitioner, Maxine Floyd, filed an application for an adjustment of claim with the Industrial Commission to recover for the death of her husband, an employee of the City of McLeansboro. The application set forth that on the 28th day of August, 1966, John S. Floyd

received an injury as a result of an accident which allegedly arose out of his employment, and allegedly resulted in his death the 22nd day of November, 1966, that he was an employee exposed to mosquito fog, resulting in respiratory irritation, pneumonia and death. Compensation was denied by the arbitrator, and his decision was sustained by the Industrial Commission. On *certiorari,* the circuit court of Hamilton County reversed the decision of the Industrial Commission and awarded the claimant $58.00 per week until the total sum of $15,000.00 had been paid; hospital expenses in the amount of $562.80, and $750.00 as statutory reimbursement for funeral expenses of the decedent. This direct appeal followed.

Floyd was employed by the City of McLeansboro, and it was stipulated that Floyd and the respondent were operating and subject to the provisions of the Workmen's Compensation Act. Ill. Rev. Stat. 1967, ch. 48, par. 138.1 *et seq.*

Floyd had been continuously employed by the respondent from April, 1964 to November, 1966, when he died. He was assigned to general all-around labor work. In the latter part of 1966, Floyd and another employee, Raymond Ray, were assigned to spray weeds, including poison ivy, at the fair grounds. Shortly after using the spray for killing weeds, both Ray and Floyd went to Dr. Donald Mitchell on August 29, 1966, for treatment of dermatitis. At approximately the same time, Floyd was assigned with another employee, Conrad Bickner, to a fogging detail for approximately one week. The chemical used for the fogging was known as Formula 2162 and was diluted with fuel oil or kerosene, 40 gallons of fuel oil to one gallon of insecticide. A fogger was placed on the rear of the truck and one individual, in this case Floyd, operated it while Bickner drove.

After seeing Dr. Donald Mitchell on August 29, 1966, Floyd only returned to his office once more, did not see the doctor, but rather received medication from the nurse in the doctor's office. Thereafter, he was treated by Dr. Harrell

and Dr. Avelson at Carmi, Illinois and Dr. Gaul at Evansville, Indiana. On October 19, 1966, he began a series of treatments with Dr. Robert Ferrell in Eldorado, Illinois.

During that period from the end of August, 1966, until he entered the hospital in November, 1966, his work record was spasmodic due to developing redness of the skin; 8 or 9 boils on each arm; and, a carbuncle on one arm and one knee.

Approximately one week before he entered the hospital on November 17, 1966, in addition to being treated by Dr. Ferrell for the dermatitis, carbuncles and boils, he developed a cold and bronchitis, and was admitted to the hospital due to the bronchial condition. When Floyd entered the hospital, he had no large infections, although the skin wasn't entirely well and he had a partially healed boil on the right wrist. Upon admission into the hospital it was discovered he had pneumonia. Five days later he died, and the cause of death was recorded as bilateral pneumonia, viral origin.

Dr. Mitchell testified on behalf of the petitioner and stated he had treated Floyd on August 29 for the dermatitis, and that in his opinion he had a rash on his arm from exposure to poison ivy. He further testified that Floyd had come to his office on August 31 and was administered medication by his nurse. Dr. Mitchell did not testify in relation to the causal effect of Floyd's demise. Neither Dr. Harrell, Dr. Avelson nor Dr. Gaul were called as witnesses.

Dr. Ferrell, who first treated Floyd on October 19, 1966, stated that Floyd had severe generalized allergic dermatitis, and that this was complicated by several boils and one large carbuncle on the right forearm. In his opinion, this condition had begun some time in October. Dr. Ferrell further testified he had treated him with antibiotics, acthorgel, intravenous calcium salts, steroids and a lotion for the itching. He further testified that the skin condition had not improved satisfactorily on the date of Floyd's admission to the hospital, but there were no large infections, no carbuncles,

just some small pustules. It was his opinion that the skin infections, carbuncles and boils caused a general run-down condition which contributed to the demise, but admitted that the pneumonia and the dermatitis have entirely different causative agents.

Before the Industrial Commission, claimant submitted the record and the deposition of Dr. Miller and respondent, the deposition of Dr. Robert H. Lund.

Dr. Miller testified he was a pathologist and, that after examining the records, there may be a causal connection between the dermatitis and pneumonia which contributed in some measure to the man's demise. He further testified dermatitis may or may not have been directly related to the fogging. After rendering his opinion that there was a possible causal connection between the dermatitis, carbuncles, boils, the use of steroids in the treatment thereof, and Floyd's eventual death due to pneumonia, whether viral or bacterial, he further stated he was merely dealing with possibility versus probability.

Dr. Lund, a surgeon who had a background in pathology, stated that he could not conclude that there was a causal connection between the dermatitis and the demise due to pneumonia. He further stated that the medical record submitted to the arbitrator was confusing as to the cause of the dermatitis, but stated that from the records it appeared that dermatitis, carbuncles and boils were not severe at the time of Floyd's admission to the hospital. He further testified that there is nothing in the record to establish a dosage of steroids which would have contributed to Floyd's death. It was therefore his opinion that it was not established that there was a causal connection between the dermatitis and the death by pneumonia.

The resolution of conflicting medical testimony is peculiarly within the province of the Industrial Commission, including that of causal connection. (*Precision Connecting*

*Rod Service* v. *Industrial Com.*, 40 Ill.2d 277, 279; *Holiday Inns of America* v. *Industrial Com.*, 43 Ill.2d 88, 90.) We recently declared that "The concern of a court of review in Industrial Commission cases such as these is not to determine medical questions, on which, it appears, men of learning in that field disagree, but rather to pass on the legal question presented, *viz.*, are the findings of the Industrial Commission contrary to the manifest weight of the evidence before it." (40 Ill.2d at 281.) Thus, unless the findings of the Industrial Commission are manifestly against the weight of the evidence they will not be disturbed on review and this without regard to how this court might or would have decided the case had it been the trier of the facts. (*Gould National Batteries, Inc.* v. *Industrial Com.*, 34 Ill.2d 151, 158; *Mechanics Universal Joint Div., Borg-Warner Corp.* v. *Industrial Com.*, 21 Ill.2d 535, 538.) The Commission was presented with conflicting medical testimony. The treating doctor who testified was not even aware of the date of the origin of the dermatitis. His testimony and records establish that the dermatitis, boils and carbuncles were improved when claimant was admitted to the hospital acutely ill with fever, cough, pain in the chest and malaise. He certified the cause of death as bilateral pneumonia of a viral origin.

Considering this testimony with the conflicting opinions rendered by two non-attending physicians, we are not prepared to hold that the decision of the Industrial Commission was against the manifest weight of the evidence, and therefore must reverse the decision of the circuit court of Hamilton County.

*Judgment reversed.*